**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED HEBREW CONGREGATION OF ST. LOUIS, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.: |
| SELECTIVE INSURANCE COMPANY OF AMERICA, a New Jersey Corporation | ) ) ) ) | |
| Defendant. | ) ) ) | JURY TRIAL DEMANDED |

## PLAINTIFF'S COMPLAINT

# TABLE OF CONTENTS

I.   NATURE OF THE ACTION ................................................................................. 1

II.  THE PARTIES ................................................................................................ 5

III. JURISDICTION AND VENUE ......................................................................... 6

IV. FACTUAL ALLEGATIONS ............................................................................. 6

    A.    The Global COVID-19 Pandemic ................................................. 6

    B.    Steps Taken by Authorities T\to Control The Pandemic ................. 9

    C.    The Damaging Impact of the Covid-19 Pandemic on United Hebrew. ....... 12

    D.    Plaintiff's Business Insurance Policies with Defendants ................ 13

    E.    Defendants' Efforts to Discourage Insureds from Making Claims Despite Knowing That It Will Have to Pay Them ................... 19

V.  JURY DEMAND ........................................................................................... 22

COUNT I: BUSINESS INCOME BREACH OF CONTRACT ................................ 23

COUNT II: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING APPLICABLE TO BUSINESS INCOME ............................... 24

COUNT III: DECLARATORY RELIEF ............................................................... 25

COUNT IV: EXTRA EXPENSE BREACH OF CONTRACT ................................. 26

COUNT V: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING ......................................................................................... 27

COUNT VI: DECLARATORY RELIEF .............................................................. 28

PRAYER FOR RELIEF ...................................................................................... 29

PLAINTIFF UNITED HEBREW CONGREGATION OF ST. LOUIS brings this action for breach of contract, breach of the covenant of good faith and fair dealing, and declaratory and injunctive relief against SELECTIVE INSURANCE COMPANY OF AMERICA, demanding a trial by jury. It makes the following allegations based upon information and belief, except as to those allegations specifically pertaining to Plaintiff, which are based on personal knowledge.

## I.   NATURE OF THE ACTION

1.   United Hebrew Congregation of St. Louis ("Plaintiff," "United Hebrew" or "UH") is the oldest Jewish Congregation in the United States west of the Mississippi River. It held its first religious service in a rented room above a grocery store near the St. Louis riverfront during the High Holy Days in 1837 and since then has become one of the leading Jewish houses of worship in the St. Louis area and indeed the United States. It has had a distinguished series of senior rabbis, including the first Jewish clergyperson to speak at a Presidential inauguration, Rabbi Samuel Thurman, who said a blessing at Harry S Truman's inauguration in 1949. In 1965, Rabbi Jerome Grollman marched with Dr. Martin Luther King at Selma, Alabama, five years after he had invited Dr. King to speak at United Hebrew when few other organizations were willing to host him. United Hebrew still has the chair in which Dr. King took a brief nap before his talk. Current Senior Rabbi Brigitte Rosenberg has been a national spokesperson for how synagogues are navigating through the current COVID-19 pandemic.[1]

2.   United Hebrew has approximately 900 member families. Besides its members' annual dues and donations, it depends for its income on fees and payments for certain specific services, such as an early childhood center, summer camp and Religious School, a catering service, gift shop purchases, an annual gala dinner, rental of the building to outsiders, and other sources.

---

[1] *See* Rabbi Rosenberg's appearance on the PBS News Hour, https://www.pbs.org/video/keeping-the-faith-1588109107/ (accessed 7/1/2020).

3.   To make sure that it would be protected in the event of a catastrophic event beyond its control, United Hebrew purchased a business insurance policy from Defendant Selective Insurance Company of America ("Selective"). That policy promises to indemnify the policyholder for actual business losses incurred when business operations are involuntarily suspended, interrupted, or curtailed because of direct physical loss of or damage to its property. This coverage, commonly known as "business interruption" or "business income" coverage, is standard in most all-risk commercial property insurance policies.

4.   Insurance is a way to manage risk, providing protection from financial loss. It is especially appropriate – indeed, vital – for protection against losses that, while unlikely, would be financially devastating if they occur. As Selective's website states, business owners insurance "can help keep you going" when disaster strikes or "the worst case scenario becomes reality":[2]

# BUSINESS OWNERS POLICY INSURANCE

## BROAD, CONVENIENT, AND AFFORDABLE BUSINESS INSURANCE

When you own a small business, your business is your life and passion. You want to protect your business and your livelihood. But if the worst case scenario becomes reality, your business owners policy with Selective can help keep you going.

---

[2] https://www.selective.com/for-businesses/businesses-insurance-coverage/business-owners-policy (accessed 6/19/2020).

2

5.   Selective tells its customers and prospects, "There are a lot of things that can go wrong in a business." Thus, Selective's business insurance includes "business interruption service," which, as it states, "covers you if your business suffers after a disaster" so that "you can rebuild" and "get back to business with minimized loss."[3] Here is a screen shot:

There are a lot of things that can go wrong in a business, but Selective has the business insurance coverage you need. Business insurance can be confusing sometimes, so here's a breakdown of some common coverages that may be a good fit for you.

Business interruption service 

Business interruption service covers you if your business suffers after a disaster. With this business insurance coverage, you can rebuild or relocate, and get back to business with minimized loss.

6.   To protect itself from just such a disaster, United Hebrew purchased business insurance, including business interruption coverage, from Selective for many years, including from July 1, 2019 to July 1, 2020.

7.   Then in March 2020, disaster struck – or to borrow from Selective's website, the worst-case scenario became reality. That reality was the worst health crisis to hit the State of Missouri, the United States, and indeed the world in over a century, a worldwide pandemic of a disease called COVID-19. It caused massive illness and death.

---

[3] https://www.selective.com/for-businesses/businesses-insurance-coverage/business-owners-policy/ (accessed 6/19/2020).

3

8.  As a result of the pandemic and to protect against its spread, on March 16, 2020, the White House advised all Americans: "Do not go to work. Do not go to school."[4]

9.  A few weeks later, on April 3, the State of Missouri issued a "Stay at Home" Order, a restriction that remained in effect from April 6 through May 3, 2020.[5] Individuals were ordered to avoid leaving their homes or places of residence. Schools were ordered closed.

10. At the end of that period, Missourians were allowed to leave their homes but only if they practiced "social distancing."[6] Schools were still ordered to remain closed.

11. These advisories and restrictions – and indeed, the pandemic itself – have caused United Hebrew to suffer losses in the hundreds of thousands of dollars.

12. However, Defendant refuses to comply with its obligation to pay for business income losses and covered expenses incurred by policyholders as a result of the physical loss of their insured property arising from the COVID-19 pandemic. It has proclaimed that refusal publicly.[7]

13. In announcing this refusal, Selective blatantly misstated what its policies provide by asserting that there had to be physical damage *to* the policyholder's property even though its policies provide for coverage where there was a loss of the property, as there was here. Selective has done so to avoid acknowledging coverage that it owes its policyholders. Accordingly, United Hebrew seeks in this lawsuit to recover its extensive COVID-19 losses and also seeks a declaratory judgment that Defendant is contractually obligated to pay these losses. In addition, Plaintiff seeks damages, costs, and any other relief that this Court deems equitable and just, arising out of Defendant's breach of contract and wrongful conduct alleged herein.

---

[4] https://www.reuters.com/article/health-coronavirus-trump-guidelines-idUKL1N2B95Q1 (accessed 6/19/2020).
[5] https://governor.mo.gov/priorities/stay-home-order (accessed 6/19/2020).
[6] https://governor.mo.gov/sites/gov/files/media/pdf/2020/04/Economic-Reopening-Phase-1.pdf (accessed 5/19/2020).
[7] https://www.selective.com/info-center/coronavirus-message (accessed 6/19/2020).

4

## II.  THE PARTIES

14. United Hebrew is a Jewish Congregation in St. Louis County, Missouri, affiliated with the Reform movement. It has a sanctuary, meeting hall and school building on its campus in Chesterfield and a cemetery in University City. It is the oldest Jewish congregation west of the Mississippi. At the time of its founding in 1837, it was only the twentieth synagogue in the United States, and it is currently the country's 13th oldest synagogue operating under its original incorporation.

15. Most of United Hebrew's members live in St. Louis County. Lesser numbers live in the City of St. Louis and St. Charles County.

16. United Hebrew purchased a Commercial Policy from Selective for the period of July 1, 2019 to July 1, 2020.

17. Selective is an insurance company, regulated by the Division of Insurance, incorporated in New Jersey, with its home office at 40 Wantage Ave., Branchville, NJ 07890.

18. Selective is one of 10 wholly-owned insurance subsidiaries of Selective Insurance Group, Inc., an insurance holding company. In 2019, Selective Insurance Group, Inc. was ranked as the 41st largest property and casualty group in the United States, based on net premiums written.[8] In the fourth quarter of 2019 its financial strength was rated as "A (Excellent)." In an SEC report, Selective stated that this rating was based "on our strong balance sheet, sustained profitability, favorable business profile, and appropriate enterprise risk management," as well as "our improved profitability over the past five years on an absolute basis and relative to our peers."[9]

---

[8] Selective Insurance Group, Inc., 2019 SEC Form 10-K at 4.
[9] Selective Insurance Group, Inc., 2019 SEC Form 10-K at 4.

## III. JURISDICTION AND VENUE

19. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(1) because the matter in controversy exceeds $75,000, exclusive of interests and costs and there is complete diversity between the parties.

20. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part, if not all, of the acts and omissions complained of in this action took place in this district.

## IV. FACTUAL ALLEGATIONS

### A.  The Global COVID-19 Pandemic

21. According to the World Health Organization ("WHO"), COVID-19 is an infectious disease for which there are no vaccines or treatments.[10] It spreads easily from person-to-person.[11]

22. When an infected person coughs, sneezes, or even just talks, droplets with the infectious agent fly into the air from the person's nose or mouth and can thereby infect others. This can occur even if the person is asymptomatic.[12] As WebMD states, "Some people who don't know they've been infected can give it to others. This is called asymptomatic spread. You can also pass it on before you notice any signs of infection, called presymptomatic spread."[13]

23. Thus, there is no way to know whether a person with whom one comes into contact might be spreading the disease.

24. The coronavirus can live in the air for up to three hours, be breathed in by others, and get into their lungs, where it can infect them.[14]

---

[10]  https://www.who.int/health-topics/coronavirus#tab=tab_1 (accessed 5/10/2020).
[11] https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html#:~:text=On%20March%2011%2C%20the,of%20new%20influenza%20viruses. (accessed 5/10/2020).
[12] https://www.webmd.com/lung/coronavirus-transmission-overview#1 (accessed 5/10/2020).
[13] *Id.*
[14] *Id.*

25. The coronavirus can also infect people who touch surfaces, such as countertops, furniture, doorknobs and other surfaces in a facility like United Hebrew's if it contains the virus. It can live on plastic and stainless steel for up to three days.[15]

26. According to the Centers for Disease Control, COVID-19 can cause mild to severe symptoms, such as cough, shortness of breath or difficulty breathing, fever, chills, muscle pain, sore throat and loss of taste or smell.[16]

27. COVID-19 is a new disease. The first known outbreak was a cluster of cases of pneumonia in Wuhan, Hubei Province in China in December 2019.[17] The disease did not even have an official name when WHO declared a "Public Health Emergency of International Concern" on January 30, 2020.[18] The disease was given its name by WHO on February 11, 2020, short for "coronavirus disease 2019." [19]

28. After it was discovered, COVID-19 spread rapidly. On March 11, 2020, "[d]eeply concerned both by the alarming levels of spread and severity, and by the alarming levels of inaction, WHO made the assessment that COVID-19 can be characterized as a pandemic."[20]

29. A pandemic is "an outbreak of a disease that occurs over a wide geographic area and affects an exceptionally high proportion of the population."[21] To be classified as a pandemic, WHO requires "the worldwide spread of a new disease."[22]

30. At the point that WHO called COVID-19 a pandemic on March 11, the number of cases outside China in just the past two weeks had increased by 13-fold to 118,000 in 114 countries;

---

[15] *Id.*
[16] https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (accessed 5/22/2020).
[17] https://www.who.int/news-room/detail/27-04-2020-who-timeline---covid-19 (accessed 5/10/2020).
[18] https://www.who.int/emergencies/diseases/novel-coronavirus-2019/events-as-they-happen (accessed 5/10/2020).
[19] https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200211-sitrep-22-ncov.pdf?sfvrsn=fb6d49b1_2 (accessed 5/10/2020).
[20] https://www.who.int/news-room/detail/27-04-2020-who-timeline---covid-19 (accessed 5/10/2020).
[21] https://www.merriam-webster.com/dictionary/pandemic (accessed 5/11/2020) (accessed 5/10/2020).
[22] https://www.who.int/csr/disease/swineflu/frequently_asked_questions/pandemic/en/ (accessed 5/10/2020).

more than 4,000 people had lost their lives, and as the Director-General of WHO stated, "[t]housands more [were] fighting for their lives in hospitals."[23]

31. According to the COVID Tracking Project, by that same date, March 11, 1,813 patients had tested positive in the United States, and 43 patients had died. From that date on, the number of cases and deaths increased exponentially. By March 17, 2020, less than a week later, when Governor Parson advised Missourians not to eat in restaurants, the number of cases nationwide had increased approximately 5 times to 8,863, and the number of deaths had increased by approximately three times to 120.[24]

32. By the time Missouri issued its "Stay at Home" Order on April 3, 2020, positive tests nationwide had increased *another 31 times* to 276,047 and deaths another *59 times* to 7,112.[25]

33. As of July 5, 2020, according to the *New York Times*, there were 2.9 million COVID-19 cases in the United States, with 130,000 deaths.[26] That was more than any other country in the world and the 11th and 9th highest on a per capita basis, respectively.[27]

34. Missouri was hit by COVID-19 later than other states, but once it arrived it spread rapidly. As of March 11, 2020, when COVID-19 was first declared a worldwide pandemic, there was only one reported case in Missouri and no deaths. By March 17, there had been eight positive tests and still no deaths. But by April 3, when Gov. Parson issued his "Stay at Home" Order, the number of cases had skyrocketed to 2,113 and 19 Missourians had died of the disease.[28] As of July 5, there had been 24,265 cases, and 1,062 COVID-19 deaths in Missouri.[29]

---

[23] https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020 (accessed 5/10/2020).
[24] https://covidtracking.com/data/us-daily (accessed 5/21/2020).
[25] https://covidtracking.com/data/state/missouri#historical (accessed 5/21/2020)
[26] https://www.nytimes.com/interactive/2020/world/coronavirus-maps.html (accessed 7/5/2020).
[27] *Id.*
[28] https://covidtracking.com/data/state/missouri#historical (accessed 5/21/2020)
[29] https://www.nytimes.com/interactive/2020/us/missouri-coronavirus-cases.html (accessed 7/5/2020)..

35. The rate of infection in St. Louis County and the City of St. Louis, where many members of United Hebrew live, quickly caught up with the rest of the country. As of July 5, per 100,000 residents in the County and City respectively, there had been 693 and 858 cases and 59 and 53 deaths;[30] that compares to 883 cases and 40 deaths per 100,000 in the United States as a whole.[31]

**B.  Steps Taken by Authorities to Control the Pandemic**

36. On March 13, 2020, the White House issued a proclamation declaring "that the COVID-19 outbreak in the United States constitutes a national emergency"; it specified that the emergency had actually begun March 1, 2020.[32]

37. Also on March 13, Governor Mike Parson signed an executive order declaring a state of emergency in Missouri due to COVID-19.[33]

38. On that same date, a state of emergency presented by COVID-19 was declared in St. Louis County, where United Hebrew is located and many of its members live, as well as St. Louis City and St. Charles County, home of other United Hebrew members.[34]

39. Three days later, on March 16, 2020, as a result of the pandemic, the White House gave all Americans this blunt advice: "Work or engage in schooling from home whenever possible."[35]

40. Shortly thereafter, on April 3, 2020, the Missouri Department of Health and Senior Services issued a "Stay at Home" Order,[36] which *mandated* that every person in Missouri avoid

---

[30] https://www.nytimes.com/interactive/2020/us/missouri-coronavirus-cases.html(accessed 7/5/2020).
[31] https://www.nytimes.com/interactive/2020/world/coronavirus-maps.html  (accessed 7/5/2020).
[32] https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/ (accessed 5/21/2020).
[33] https://governor.mo.gov/press-releases/archive/governor-parson-signs-executive-order-20-02-declaring-state-emergency (accessed 5/19/2020).
[34] https://www.sccmo.org/DocumentCenter/View/15338/State-of-Emergency-COVID-19-PDF; https://www.stlouis-mo.gov/government/departments/health/communicable-disease/covid-19/documents/covid-19-public-health-emergency-order-and-proclamation.cfm; https://stlcorona.com/dr-pages-messages/exec-orders/county-executive-order-15-restrictions-on-activities-to-limit-spread-of-covid-19/; (all accessed 5/21/2020).
[35] https://www.reuters.com/article/health-coronavirus-trump-guidelines-idUKL1N2B95Q1 (accessed /19/2020).
[36] https://governor.mo.gov/priorities/stay-home-order (accessed 6/13/2010).

leaving their homes and places of residence beginning on April 6. After an extension, that Order remained in effect through May 3, 2020.[37]

41. St. Louis County, the City of St. Louis and other counties in Missouri acted even earlier to order residents to remain at home.

42. For example, on March 21, 2020, St. Louis County Executive Dr. Sam Page issued an Executive Order, commanding the Director of the St. Louis County Department of Public Health to issue an order directing that "people stay home when possible" other than, *inter alia*, to "perform tasks essential to the health and safety of individuals, their families, their household members, and their pets, such as … visiting a health care professional or hospital …."[38]

43. On March 23, 2020, the St. Louis County Director of Public Health issued a Stay at Home Order and, subsequently an Amended Stay at Home Order, that allowed residents to leave home to engage in "Essential Activities." The Order was scheduled to remain in place until 11:59 April 22, 2020.[39] Essential Activities did not include United Hebrew's revenue-gaining activities, such as the pre-school, summer day camp, gift shop, commemorative banquets, the senior services, or the events for which United Hebrew rented its building. They included K-12 schools only for purposes of facilitating distance learning.

44. That Order was amended on April 23, 2020, and again on May 4, 2020, extending the Stay at Home Order indefinitely.[40]

---

[37] file:///C:/Users/rcorn/Downloads/Stay-at-Home%20Order%20Final%204-16.pdf (accessed 6/13/2020).

[38] https://stlcorona.com/dr-pages-messages/exec-orders/county-executive-order-15-restrictions-on-activities-to-limit-spread-of-covid-19/ (accessed 6/11/2020) (emphasis added).

[39] https://stlcorona.com/dr-pages-messages/public-health-orders/director-of-public-health-amended-stay-at-home-order/;
https://stlouisco.com/portals/8/docs/document%20library/CountyExecutive/Executive%20Orders/Stay%20at%20Home%20Order.pdf (both accessed 5/11/2020).

[40] https://stlcorona.com/dr-pages-messages/public-health-orders/director-of-public-health-extension-and-amendment-of-stay-at-home-order/; https://stlcorona.com/news/dph-covid-19-update-542090/ (both accessed 5/11/2020.)

45. On May 8, 2020, the St. Louis County Director of Public Health eased the restrictions somewhat effective May 18 but still noted: "All Gatherings pose an increased risk of transmission and should be voluntarily avoided whenever possible."[41] The May 18 order limited gatherings in a single space or room, indoors or outdoors, to 10 persons, and required compliance with Social Distancing Requirements and Face Covering Requirements. That order was reiterated on May 30 and remains in effect.[42]

46. Meanwhile, the City of St. Louis issued a Stay at Home Order that, as in St. Louis County, went into effect March 23. It ordered all individuals living in the City to remain at home with certain exceptions including "[t]o perform tasks essential to the health and safety of individuals, their family [and] household members … such as … visiting a health care professional."[43] That order was extended on April 16, 2020, with no definite ending date.[44] On May 11, 2020, the City Health Commissioner entered an order similar to that in St. Louis County, allowing limited re-opening as of May 18.[45]

47. St. Charles County also acted in March. On March 23, 2020, St. Charles County Executive Ehlmann issued an order that every person in the County must remain in their residence or surrounding property except to engage in "(a) activities they deem essential to their physical, mental, and spiritual well-being, or (b) employment and in doing either shall comply with prudent social distancing and disease mitigation advice from the Centers for Disease

---

[41] https://stlcorona.com/dr-pages-messages/public-health-orders/director-of-public-health-business-and-individual-guidelines-for-social-distancing-and-re-opening/ (accessed 6/13/2020).
[42] https://stlcorona.com/dr-pages-messages/public-health-orders/director-of-public-health-amended-business-and-individual-guidelines-for-social-distancing-and-re-opening/ (accessed 7/1/2020).
[43] https://www.stlouis-mo.gov/government/departments/health/communicable-disease/covid-19/documents/upload/Health-Commission-s-Order-5-03-21-2020.pdf (accessed 5/11/2020).
[44] https://www.stlouis-mo.gov/government/departments/health/communicable-disease/covid-19/documents/upload/Health-Commissioner-s-Order-No-7.pdf (accessed 5/11/2020).
[45] https://www.stlouis-mo.gov/government/departments/mayor/news/city-of-st-louis-to-begin-gradually-reopening-on-may-18.cfm (accessed 6/13/2020).

Control and Prevention, the Missouri Department of Health and Senior Services and the St. Charles County Department of Public Health."[46]

**C.  The Damaging Impact of the COVID-19 Pandemic on United Hebrew.**

48. The COVID-19 pandemic, along with the recommendations and restrictions described above, have had an adverse impact on United Hebrew's financial position.

49. The dues, donations and bequests received by United Hebrew constitute less than half of its revenues. For a majority of its revenues it depends on fees for its Early Childhood Center, summer camp, Religious School, catering services, building rentals (for Bnai Mitzvah lunches and events of outside entities), and senior services, as well as its gift shop and its annual gala dinner. Much of its income from catering comes from sponsorships of its popular Friday night "Shabbat Nosh," at which hundreds of members gathered weekly to socialize and enjoy a pre-Shabbat service meal.

50. The COVID-19 pandemic has had a devastating effect on these revenues.

51. Because of the pandemic, United Hebrew shut its doors on March 18, 2020. As of that date, it closed its Gift Shop, ended its catering (including the Shabbat Nosh) and, except for distance learning, closed its Early Childhood Center and Religious School, as well as its senior and other fee-based programming. It also canceled its summer day camp for 2020. UH also was forced to cancel, and stop offering, events for which it received building rentals.

52. United Hebrew's annual gala dinner and Chai Society induction, which honors members who have made important contributions to the congregation, is its largest fundraiser of the year. The Congregation not only receives the price of admission, but proceeds of the silent auction of items donated by local businesses, such as restaurant dinners, tickets to sporting events and theaters, spa visits and the like. Items sold at the event, such as "wine pulls," raffle tickets, and

---

[46] https://www.sccmo.org/DocumentCenter/View/15365/20-06-Executive-Order-PDF (accessed 5/21/2020).

"sign-up parties," brought in additional revenue. United Hebrew also publishes a "tribute book," with paid advertisements by local businesses, such as businesses hoping to be hired for Bar and Bat Mitzvahs and weddings. This year's event, at which five members were to be inducted in the Chai Society, had been scheduled for April 25. Because of the pandemic, it was canceled and rescheduled as a "remote" event on August 30, 2020. The silent auction had to be considerably scaled back because there are no sporting events, theaters are closed, restaurant dinners are largely unavailable, and other businesses have shut down. Advertisements by local businesses in the tribute book will be reduced because, for example, there are no Bar/Bat Mitzvah or wedding parties for them to service. Because the event will be remote, attendance will be down and sales of items like raffle tickets and "wine pulls" will therefore suffer. Nor is there any demand for "sign-up" parties because nobody can have parties during the pandemic. As a result, United Hebrew expects the proceeds of the "gala" will be considerably reduced.

53. United Hebrew does not know the full extent of its losses due to COVID-19 but they are currently in the hundreds of thousands of dollars and are continuing.

**D.  Plaintiff's Business Insurance Policies with Defendant**

54. In exchange for premiums paid by Plaintiff to Defendant, Plaintiff obtained a Commercial Policy, Policy No. S 1793099, covering a Policy Period from July 1, 2019 to July 1, 2020 ("The Policy"). *See* Ex. A. at 2 (all page numbers in citations to exhibits  refer to the page of the pdf).

55. The Policy contains an index of various "Forms and Endorsements [that] are applicable to the Commercial Property Coverage Part." Ex. A at 6. One of those Forms is "Business Income Coverage with Extra Expense," shown as having the Form number CP 00 30 1012. *Id.*

56. The "Business Income (and Extra Expense) Coverage Form," Form CP 00 030 10 12 (Ex. B), provides coverage for lost Business Income and Extra Expense. It states:

13

> We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by *direct physical loss of* or damage to property at premises which are described in the Declarations and for which a Business Income Limit Of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss.

Ex. B at 2 (emphasis added).

57. The Policy's Commercial Property Coverage Declaration states that Business Income coverage includes the "Actual Loss" with a waiting period of 72 hours. Ex. A at 18.

58. The Policy's Declaration containing the Schedule of Location shows that The Policy includes three premises: 13788 Conway Rd, Saint Louis, MO 63141 (United Hebrew's main building, containing the sanctuary and school building), 7855 Canton Ave, Saint Louis, MO 63130 (United Hebrew Cemetery), and 13742 Conway Rd., Saint Louis, MO 63141 (vacant land east of the main building). Ex. A at 4.

59. As can be seen, The Policy provides coverage not just for *damage* to property at the premises, but also for "loss of" property. United Hebrew suffered loss of property when the COVID-19 pandemic prevented it from using its property for its intended business functions, such as the Early Childhood Center, summer day camp, and other uses described above.

60. Business Income (and Extra Expense) Coverage Form defines Business Income as the:

> a. Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and
>
> b. Continuing normal operating expenses incurred, including payroll.

Ex. B at 2.

61. The Policy also covers Extended Business Income for losses that occur after the property is restored, as follows:

> If the necessary "suspension" of your "operations" produces a Business Income loss payable under this policy, we will pay for the actual loss of Business Income you incur during the period that:

14

(a) Begins on the date property (except "finished stock') is actually repaired, rebuilt or replaced and 'operations' are resumed; and

(b) Ends on the earlier of:

(i) The date you could restore your "operations", with reasonable speed, to the level which would generate the business income amount that would have existed if no direct physical loss or damage had occurred; or

(ii) 60 consecutive days after the date determined in (1)(a) above.

However, Extended Business Income does not apply to loss of Business Income incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located.

Loss of Business Income must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss.

Ex. B at 4.

62. "Suspension" means "[t]he slowdown or cessation of your business activities …." Ex. B at 10. That applies to Plaintiff's Business Income losses because, as a result of the COVID-19 pandemic, its business activities slowed down or ceased.

63. "Operations" means "[y]our business activities occurring at the described premises …." Ex. B at 10. That applies to Plaintiff's operations of its business, including its Early Childhood Center, summer day camp, Religious School, catering services, gift shop, senior services, and annual gala dinner.

64. For business income coverage, "period of restoration" starts "72 hours after the time of direct physical loss or damage …." Ex. B at 10.

65. The COVID-19 pandemic caused a direct physical loss of property at Plaintiff's premises at the Scheduled Locations by denying Plaintiff the ability to physically access and use the property in the normal fashion in its business and/or denying its members and others the ability to physically access and use the property. It is therefore a covered loss.

15

66. The Policy sets forth the method to determine the amount of Business Income loss. It states:

> The amount of Business Income loss will be determined based on:
>
> > (1) The Net Income of the business before the direct physical loss or damage occurred;
> >
> > (2) The likely Net Income of the business if no physical loss or damage had occurred, but not including any Net Income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses;
> >
> > (3) The operating expenses, including payroll expenses, necessary to resume "operations" with the same quality of service that existed just before the direct physical loss or damage; and
> >
> > (4) Other relevant sources of information, including:
> >
> > > (a) Your financial records and accounting procedures;
> > >
> > > (b) Bills, invoices and other vouchers; and
> > >
> > > (c) Deeds, liens or contracts.

Ex. B at 6-7.

67. The Policy also covers Extra Expense, which is defined as "necessary expenses you incur during the 'period of restoration' that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss." Ex. Ex. B at 2.

68. The Policy sets forth the method of determining recoverable Extra Expense. It states:

> a. The amount of Extra Expense will be determined based on:
>
> > (1) All expenses that exceed the normal operating expenses that would have been incurred by "operations" during the "period of restoration" if no direct physical loss or damage had occurred. We will deduct from the total of such expenses:

16

(a) The salvage value that remains of any property bought for temporary use during the "period of restoration", once "operations" are resumed; and

(b) Any Extra Expense that is paid for by other insurance, except for insurance that is written subject to the same plan, terms, conditions and provisions as this insurance; and

(2) Necessary expenses that reduce the Business Income loss that otherwise would have been incurred.

Ex. B at 7.

69. The COVID-19 pandemic is a "covered cause of loss" under The Policy. Covered Causes of Loss are those described in the Causes of Loss form. *See* Ex. B at 2.

70. The Causes of Loss – Special Form defines Covered Causes of Loss as "direct physical loss unless the loss is excluded or limited in this policy." Ex. A at 36.

71. None of the Exclusions, limitations, or limits in the Causes of Loss – Special Form apply to Plaintiff's loss. *See* Ex. A at 36-42. That form contains no exclusion or limitation for losses caused by a pandemic.

72. Paragraph B of the Causes of Loss – Special Form is called "Exclusions." Subparagraph 1 of that Paragraph states:

**1.** We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

Ex. A at 36.

73. There follows a list of various items that are excluded, such as earthquakes, nuclear radiation, War, and "'Fungus,' Wet Rot, Dry Rot and Bacteria." Ex. A at 36. None of the items in this list apply to the loss United Hebrew experienced because of the COVID-19 pandemic.

74. The Policy also contains a separate Endorsement titled, "Exclusion of Loss Due to Virus or Bacteria" (Ex. C), which states:

> We will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease.

75. That exclusion does not apply to United Hebrew's loss because that loss was not caused by a virus. There is no evidence that the virus has ever been in United Hebrew's premises. Plaintiff's loss was caused by a pandemic and the precautionary measures taken by federal, state and local officials to prevent its spread.

76. Selective could have employed broader causation language in the Virus Exclusion and thereby excluded United Hebrew's losses due to the pandemic. It does use such language elsewhere in the Policy, but not in the Virus Exclusion.

77. For example, the General Exclusion provision in the Causes of Loss – Special Form states:

> We will not pay for loss or damage caused directly *or indirectly* by any of the following. Such loss or damage is excluded *regardless of any other cause or event that contributes concurrently or in any sequence to the loss*.

Ex. A at 36 (emphasis added).

78. Similarly, the Policy contains a separate "Exclusion of Certain Computer-Related Losses" that states:

> We will not pay for loss ("loss") or damage caused *directly or indirectly* by the following. Such loss ("loss") or damage is excluded *regardless of any other cause or event that contributes concurrently or in any sequence* to the loss ("loss") or damage.

Ex. D at 4 (emphasis added).

79. In the Virus Exclusion, however, Selective elected to use the more restrictive causation language, "caused by or resulting from," rather than "caused directly or indirectly." Therefore, the Virus Exclusion does not apply if the virus causes the loss indirectly. Here, if the coronavirus has any causal relationship to United Hebrew's losses, it is indirect.

18

80. Nor does the Virus Exclusion apply if there is any other cause or event that contributes concurrently or in any sequence to the loss. Here, the other causes are the pandemic, the orders by governmental and other authorities to stay at home, and the urgings of scientific and professional groups like CDC.

81. Selective also did not incorporate the Virus Exclusion into Paragraph B, the Exclusions section of the Causes of Loss – Special Form. The Virus Exclusion is an entirely separate Endorsement. Thus, the "directly or indirectly" or "regardless of any other cause or event that contributes" language of Paragraph B does not apply to the Virus Exclusion.

82. For the above reasons, Plaintiff is entitled to coverage under the above provisions of The Policy.

**E.  Defendant's Efforts to Discourage Insureds from Making Claims Despite Knowing That It Will Have to Pay Them**

83. Defendant has taken no steps to cover its insureds for their COVID-related business losses. To the contrary, it tells insureds and the public that these business losses are not covered.

84. Defendant has a web page with its message to insureds regarding COVID-19. That page has a title that states, "A MESSAGE TO SELECTIVE CUSTOMERS."[47] Here is a screenshot of the title of that page:

---

[47] https://www.selective.com/info-center/coronavirus-message (accessed 6/26/2020).

19



85. Nowhere on this page does Selective acknowledge to its customers that their COVID-19 losses are covered by its Policy. To the contrary, Selective misquotes its policies and thereby attempts to mislead customers into thinking that their losses are not covered. In the third paragraph in the screenshot below, Selective says that COVID business income losses are not covered because viruses do not cause physical loss or damage to property and "business income losses must be cause by direct physical loss or damage to certain property …":[48]

---

[48] https://www.intrepiddirect.com/covid-19/ (accessed 5/22/2020).



86. As can clearly be seen above, this is false. Selective's business policies cover "direct physical loss *of* or damage to covered property," not loss *to* property. By omitting the critical word "of," Selective is attempting to mislead consumers into believing that something must have happened "to" their property for the policies to cover their losses.

87. In the fourth paragraph of the above, Selective attempts to mislead policyholders into thinking that the Virus Exclusion blocks coverage of COVID business losses but doesn't even address how the Virus Exclusion can apply to a loss indirectly caused by a virus when indirect effects are not written into this Exclusion as they are for other Exclusions. Nor does Selective address the fact that the Virus Exclusion doesn't say – as other exclusions do – that it applies even if there is another cause that contributes, as there is here. Selective is simply trying to mislead its policyholders into not submitting claims.

88.   Despite that strategy, United Hebrew made a claim on its policy by email to Selective's agent on June 25, 2020, and asked for a response by July 2.

89.   Selective's Sr. Property Claims Associate, Wayman Hollis Sr., responded requesting a date and time to discuss the loss. United Hebrew's counsel wrote back on June 30, asking him to submit any questions that bear on whether Selective would acknowledge coverage.

90.   Mr. Hollis replied on July 1 with questions that have no relevance unless Selective was acknowledging coverage. For example, even though United Hebrew had already told Selective that it was claiming loss of business income in connection with its Early Childhood Center, catering operation, gift shop and other sources of income, Mr. Hollis asked how United Hebrew generates its revenues. That question might bear on the *amount* of United Hebrew's loss, but not on whether there was a loss considering the information already provided.

91.   Similarly, Mr. Hollis asked if United Hebrew "had to layoff any employees? If so, how many?" Whether The Policy covers United Hebrew's loss does not turn on whether any employees were laid off, but the answer to that question might affect the size of the loss.

92.   United Hebrew's counsel therefore responded that same day by asking if these questions mean that Selective was acknowledging coverage of losses due to the pandemic, despite the statements on its website.

93.   Mr. Hollis didn't respond by the deadline and hasn't responded as of the filing of this lawsuit. Plaintiff therefore concludes that Selective has rejected its claim and that Mr. Hollis' questions were not asked in a good faith effort to evaluate the claim.

## V.  JURY DEMAND

94.   Plaintiff demands a trial by jury on all claims so triable.

## COUNT I: BUSINESS INCOME BREACH OF CONTRACT

95.  Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

96.  The Policy issued by Defendant to Plaintiff is an insurance contract under which Defendant was paid premiums in exchange for promises to pay Plaintiff's losses for claims covered by The Policy.

97.  In The Policy, Defendant expressly agrees to pay for losses of Business Income incurred as a result of causes not excluded under The Policy, including losses caused by the COVID-19 pandemic. Specifically, Defendant promises to pay for losses of Business Income (including Extended Business Income) sustained as a result of a business suspension.

98.  A covered loss has resulted in business suspensions, which have caused Plaintiff lost Business Income and Extended Business Income.

99.  The business suspensions and losses triggered the Business Income and Extended Business Income coverage under The Policy.

100. Plaintiff has complied with all applicable provisions of The Policy, including payment of premiums.

101. Defendant, without justification, has refused performance under The Policy by denying coverage for these losses. Accordingly, Defendant is in breach of The Policy.

102. Due to Defendant's breach of The Policy, Plaintiff has suffered actual and substantial damages for which Defendant is liable, in an amount to be proved at trial.

## COUNT II: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING APPLICABLE TO BUSINESS INCOME

103. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

104. Defendant has breached the duty of good faith and fair dealing owed to Plaintiff in the following respects:

    a. Unreasonably acting or failing to act in a manner that deprives Plaintiff of the benefits of its Policy;

    b. Unreasonably engaging in a pattern and practice of acting or failing to act in a manner that deprives Plaintiff of the benefits of its Policy;

    c. Unreasonably failing to conduct a prompt, fair, balanced and thorough investigation of all of the bases of Plaintiff's claims;

    d. Unreasonably engaging in a pattern and practice of failing to conduct a prompt, fair, balanced and thorough investigation of all of the bases of claims made under Plaintiff's Policy;

    e. Unreasonably failing to diligently search for and consider evidence that supports coverage of Plaintiff's claims;

    f. Unreasonably engaging in a pattern and practice of failing to diligently search for and consider evidence that supports coverage of Plaintiff's claims;

    g. Unreasonably failing to conduct an investigation to determine the efficient proximate cause (predominant cause) of Plaintiff's losses;

    h. Unreasonably engaging in a pattern and practice of failing to conduct an investigation to determine the efficient proximate cause (predominant cause) on claims made by insureds;

    i. Unreasonably failing to give at least as much consideration to the interests of Plaintiff as it gives to its own interests;

    j. Unreasonably engaging in a pattern and practice of failing to give at least as much consideration to the interests of its insureds as it gives to its own interests;

    k. Unreasonably placing its own financial interests above the interests of Plaintiff; and

24

l.   Unreasonably engaging in a pattern and practice of placing its own financial interests above the interests of its insureds.

105. By acting in the aforementioned way, Defendant breached the implied covenant of good faith and fair dealing.

106. As a result of this breach, Plaintiff has been damaged in an amount to be proven at trial.

## COUNT III: DECLARATORY RELIEF

107. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

108. This Court has jurisdiction to declare the rights and other legal relations pursuant to 28 U.S.C. §§ 2201-2202.

109. Plaintiff's Policy is an insurance contract under which Defendant was paid premiums in exchange for promises to pay its losses for claims covered by The Policy.

110. In The Policy, Defendant expressly agrees to pay for loss of Business Income and Extended Business Income incurred as a result of the causes not excluded under The Policy. Specifically, Defendant promised to pay for losses of business income and extended business income sustained as a result of a business suspension.

111. A covered loss has resulted in business suspensions, which has caused Plaintiff losses.

112. The business suspensions and losses triggered the Business Income and Extended Business Income coverage under The Policy.

113. Plaintiff has complied with all applicable provisions of The Policy, including payment of premiums.

114. Defendant, without justification, has refused performance under The Policy by denying coverage for these losses and expenses. Accordingly, Defendant is in breach of The Policy.

115. Plaintiff seeks a judicial determination of whether The Policy provides coverage for Plaintiff's losses.

116. An actual case or controversy exists regarding Plaintiff's rights and Defendant's obligations under the terms of The Policy.

### COUNT IV: EXTRA EXPENSE BREACH OF CONTRACT

117. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

118. Plaintiff's Policy is an insurance contract under which Defendant was paid premiums in exchange for promises to pay Plaintiff's losses for claims covered by The Policy.

119. In The Policy, Defendant expressly agrees to pay for extra expenses incurred as a result of the causes not excluded under The Policy. Specifically, Defendant promises to pay amounts to avoid or minimize the losses from suspension of business and to continue "operations" at Plaintiff's premises, to repair or replace any property, and other expenses.

120. A covered loss has resulted in business suspensions. These suspensions have caused Plaintiff to incur extra expenses.

121. The extra expenses triggered the Extra Expense Coverage under The Policy

122. Plaintiff has complied with all applicable provisions of its Policy, including payment of premiums.

123. Defendant, without justification, has refused performance under The Policy by denying coverage for these losses and expenses. Accordingly, Defendant is in breach of The Policy.

124. Due to Defendant' breach of The Policy, Plaintiff has suffered actual and substantial damages for which Defendant is liable, in an amount to be proved at trial.

## COUNT V: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

125. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

126. Defendant has breached the duty of good faith and fair dealing owed to Plaintiff with respect to the Extra Expense provisions in the following respects:

    a.  Unreasonably acting or failing to act in a manner that deprives Plaintiff the benefits of its Policy;

    b.  Unreasonably engaging in a pattern and practice of acting or failing to act in a manner that deprives Plaintiff of the benefits of its Policy;

    c.  Unreasonably failing to conduct a prompt, fair, balanced and thorough investigation of all of the bases of Plaintiff's claims;

    d.  Unreasonably engaging in a pattern and practice of failing to conduct a prompt, fair, balanced and thorough investigation of all of the bases of claims made under Plaintiff's Policy;

    e.  Unreasonably failing to diligently search for and consider evidence that supports coverage of Plaintiff's claims;

    f.  Unreasonably engaging in a pattern and practice of failing to diligently search for and consider evidence that supports coverage of Plaintiff's claims;

    g.  Unreasonably failing to conduct an investigation to determine the efficient proximate cause (predominant cause) of Plaintiff's losses;

    h.  Unreasonably engaging in a pattern and practice of failing to conduct an investigation to determine the efficient proximate cause (predominant cause) on claims made by insureds;

    i.  Unreasonably failing to give at least as much consideration to the interests of Plaintiff as it gives to its own interests;

    j.  Unreasonably engaging in a pattern and practice of failing to give at least as much consideration to the interests of its insureds as it gives to its own interests;

    k.  Unreasonably placing its own financial interests above the interests of Plaintiff; and

27

      l.   Unreasonably engaging in a pattern and practice of placing its own financial interests above the interests of its insureds.

127. By acting in the aforementioned way, Defendant breached the implied covenant of good faith and fair dealing with respect to the Extra Expense provisions of The Policy.

128. As a result of this breach, Plaintiff has been damaged in an amount to be proven at trial.

## COUNT VI: DECLARATORY RELIEF

129. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

130. This Court has jurisdiction to declare the rights and other legal relations pursuant to 28 U.S.C. §§ 2201-2202.

131. Plaintiff's Policy is an insurance contract under which Defendant was paid premiums in exchange for promises to pay Plaintiff's claims covered by The Policy.

132. In The Policy, Defendant expressly agrees to pay extra expenses incurred as a result of the causes not excluded under The Policy. Specifically, Defendant promises to pay amounts to avoid or minimize the losses from suspension of business and to continue "operations" at Plaintiff's premises, to repair or replace any property, and other expenses.

133. A covered loss has resulted in business suspensions, which has caused Plaintiff losses.

134. These covered losses have resulted, and will result, in extra expenses, which has caused Plaintiff's losses.

135. The extra expenses triggered the Extra Expense Coverage under The Policy.

136. Plaintiff has complied with all applicable provisions of The Policy, including payment of premiums.

28

137. Defendant, without justification, has refused performance under The Policy by denying coverage for these losses and expenses. Accordingly, Defendant is in breach of The Policy.

138. Plaintiff seeks a judicial determination of whether the Extra Expense provisions of The Policy provides coverage for Plaintiff's losses.

139. An actual case or controversy exists regarding Plaintiff's rights and Defendant's obligations under the terms of the Extra Expense provisions of Plaintiff's Policy.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendant, as follows:

1. A judicial declaration declaring the meaning of the provisions of The Policy concerning the business income coverage and extra expense coverage;

2. An award of damages to Plaintiff in an amount to be determined at trial;

3. An order requiring Defendant to pay both pre- and post-judgment interest on any amounts awarded, as allowed by law;

4. An award of costs as allowed by law; and

6. Such other or further relief as may be appropriate.

Dated: July 6, 2020                                  Respectfully submitted,

                                     **LAW OFFICE OF RICHARD S. CORNFELD, LLC**
                                     By:  */s/ Richard S. Cornfeld*
                                            Richard S. Cornfeld, #31046MO
                                            Daniel S. Levy, #66039MO
                                            1010 Market Street, Suite 1645
                                            St. Louis, Missouri 63101
                                            P. 314-241-5799
                                            F. 314-241-5788
                                            rcornfeld@cornfeldlegal.com
                                            dlevy@cornfeldlegal.com

                                     ***Attorneys for Plaintiff***